UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:22 CR 155 SNLJ (ACL) |
| | ) |
| DARIUS R. CLARK, | ) |
| | ) |
| Defendant. | ) |

## **REPORT AND RECOMMENDATION**

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

Defendant Darius R. Clark filed a Motion to Suppress Search of Two Backpacks Located in Residence.  (Doc. 44.)  He claims that the consent to search given by the owner of a residence, of which he claimed to be an overnight guest, did not extend to his backpacks as the "law enforcement officer had no reasonable basis to believe [the homeowner] had authority to consent to a search of [his] personal backpacks…" *Id*. at 7.

The Government counters that it was reasonable for the officer, who received consent for a search of the residence, to believe that the homeowner had authority to consent to the search of unmarked backpacks located in the spare bedroom of her home.  (Doc. 57 at 16-17.)

Based on the evidence and legal arguments submitted by the parties, it is recommended that the following findings of fact and conclusions of law be adopted, and that the Defendant's Motion to Suppress be denied.

**Findings of Fact**

On August 16, 2022, Deputy Andrew Conley of the Dunklin County Sheriff's Department received a call from his Chief Deputy asking him to contact the United States Marshals. His task was to assist the Marshals with locating an individual who was believed to be in Kennett, Missouri. That person was Defendant Darius Roshone Clark. A warrant for Clark's arrest had been issued in Oklahoma City, Oklahoma. It was alleged that Clark had committed the offense of Murder in the First Degree on August 1, 2022. The warrant was issued at 4:35 p.m. on August 10, 2022. It was formally filed with the Circuit Clerk in the District Court of Oklahoma on August 15, 2022.

At approximately 1:37 p.m., on August 16, 2022, Deputy Conley along with additional officers from the Dunklin County Sheriff's Department, the United States Marshals Service, the Southeast Missouri Drug Task Force, and the Missouri State Highway Patrol met in a church parking lot approximately one mile away from 206 Butler Drive in Kennett, Missouri, which was where the Marshals believed Clark would be located.

The group of law enforcement officers arrived at 206 Butler Drive at 2:31 p.m. It was a very small home. The living room and kitchen could be seen from the front door, as well as a small hallway leading to two bedrooms and a bathroom. The doors to the bedrooms and bathroom were open.

The Marshals knocked on the front door of the residence and a man named Michael Freeman answered the door. His girlfriend, Rachel Hurn, was also present and she came to the front door. The Marshals also observed the Defendant in the living room. They called him out of the residence. The Defendant complied with the request.

Once in the front yard, Deputy Conley placed the Defendant in handcuffs and asked

the Defendant who he was.  The Defendant responded, "you already know who I am." Deputy Conley then asked the Defendant to identify himself.  The Defendant replied that he was Darius Clark.  Deputy Conley advised Clark of the active arrest warrant from Oklahoma. Clark was then placed in a patrol car that was parked in front of the house.  Freeman and Hurn remained in the front yard although they were not in handcuffs.

After the residence was secure, one of the Deputy Marshals asked Deputy Conley to contact Officer J.T. Revel, a homicide detective from Oklahoma City in charge of the homicide for which the Defendant had been charged.  Officer Revel asked Deputy Conley with assistance on two matters.  First, he requested that Deputy Conley secure a red Dodge Charger if it was located at the residence. Next, Officer Revel asked Deputy Conley to see if he could conduct a consent search at 206 Butler Drive.

The red Charger was present at the residence in a small one-car carport in the backyard with a tarp over it, although part of the vehicle was visible.  The Charger was towed to a secure location and later seized by law enforcement officers from Oklahoma.  An Oklahoma Search Warrant reportedly authorized a search of the vehicle.  The Dispatcher's Call History Log reflects that at 3:01 p.m., the Charger was to be picked up by Rudi's Towing and delivered to the Sheriff's Department.  The parties agree that no evidence relevant to this case was found in the Charger.

Freeman, the man who answered the front door at 206 Butler upon the arrival of the officers, advised Deputy Conley that the owner of the residence was Shanika Fane and that she worked at Family Dollar.  After Freeman, Hurn, and the Defendant exited the residence, the Marshals conducted a security sweep and no one else was found inside the home.  The Defendant was transported to the Dunklin County Detention Center by Deputy Waynick at

3:04 p.m.

At approximately 3:05 p.m., Deputy Conley left the residence to speak with Ms. Fane at Family Dollar which was located approximately one mile from 206 Butler Drive.

When Deputy Conley arrived at Family Dollar, Ms. Fane had already heard that something was happening at her house. Someone called her to notify her that law enforcement officers were at her home. Ms. Fane asked Deputy Conley for a ride to her residence, 206 Butler Drive. The pair arrived at the residence at 3:12 p.m.

Deputy Conley told Ms. Fane that he wanted to search her residence. He explained that the Defendant had been arrested for First Degree Murder and authorities were interested in locating the murder weapon. Ms. Fane affirmed that 206 Butler Drive was her residence, and she gave verbal consent for a search of the residence. She also gave written consent for the search while in the front yard of the residence. *See* Gov't. Ex. #2. The form indicated that Fane consented to a search of the house located at 206 Butler, Kennett. *Id*. Ms. Fane signed her name, printed "S. Fane," and noted the time as 3:29 p.m. *Id*. The Defendant did not challenge the voluntariness of Fane's consent in his Motion. Three or four officers entered the residence to conduct the search. Ms. Fane remained on the front porch during the search.

Deputy Conley searched the two bedrooms inside the residence. Ms. Fane indicated that she used the southwest bedroom. A stolen firearm was found in the closet within that bedroom and Ms. Fane admitted it belonged to her. State charges were filed against Ms. Fane for that criminal conduct. Ms. Fane did not indicate whether the second bedroom (referred to by the Government as a "spare bedroom," *see* Doc. 57 at 11) was occupied by anyone, or if any of the three individuals who were present at the residence had been

Page **4** of **14**

overnight guests.

The spare bedroom was situated in the southeast corner of the residence. Within that bedroom Deputy Conley found two bags. A black Air Jordan backpack was observed straight ahead in the bedroom. It contained two pieces of mail addressed to 120 N. Philadelphia Avenue, Shawnee, Kansas (one mail item had Clark's name on it and the other was addressed to a business associated with Clark); two bank cards with Clark's name on them; and pills containing fentanyl, heroin, and methamphetamine. A second bag, a black and gray Louis Vuitton backpack, was observed on the right side of the open closet door within the bedroom. It contained a Glock model 27, .40 caliber semi-automatic handgun with a Glock switch on the rear of the slide that converted the firearm into a machinegun. It was equipped with a loaded, extended magazine. There were three additional magazines inside the backpack, two of which were loaded. A wallet that contained Clark's driver's license, social security card, and $1,100 were also found in the Louis Vuitton backpack. Neither bag had markings or identification on the exterior of them. Deputy Conley was able to open the bags without having to break any locks. He could not recall if the zippers were closed rather only remembered that he had to open them to identify the contents. After seeing the contents of the backpacks, the backpacks and their contents were seized.

The officers also seized two cellular phones that belonged to Clark. One of them was found in the living room and Ms. Fane indicated it belonged to Clark. The other one was found in the bedroom where the two backpacks were found. The phones and the Glock were turned over to the Oklahoma City Police Department.

No photographs were taken of the items that were seized from 206 Butler Drive when they were found in the residence. Deputy Conley indicated the photos of the evidence were

taken at the Dunklin County Justice Center.

During the search, Ms. Fane never asked the officers to stop the search, and she did not tell them that they could not look in any location.  Deputy Conley did not know how the U.S. Marshals knew that the Clark would be found at the residence.  He also did not know whether Clark had been an overnight guest or if he was simply a houseguest upon the officers' arrival.  Other than the brief interaction Deputy Conley had with Clark while arresting him in the front yard, Conley did not ask Clark any questions about his presence at the residence (*i.e.*, how long he had been there, what room he had used if he was staying there, or if he had any personal belongings inside the residence.)  Nor did Deputy Conley inquire as to whether Freeman or Hurn had a connection to the house, or any personal belongings in the house; or whether they were overnight guests or anything of that sort.

In addition to the red Charger, a second vehicle was parked at 206 Butler Drive.  That being a SUV claimed by Freeman.  Deputy Conley could not recall the registered owner of the SUV.

Prior to the evidentiary hearing, Clark's attorney secured subpoenas for both Michael Freeman and Rachel Hurn.  The Marshals attempted to serve the subpoenas at the last known residence for Freeman and Hurn, however, they no longer lived at those addresses.  Although the Court offered to grant leave for a supplemental hearing to allow another attempt at locating Freeman and Hurn, Clark did not ask for leave.

Clark moves for suppression of the evidence seized from the residence located at 206 Butler Drive, Kennett, Missouri.

## II. Conclusions of Law

In support of his request for suppression of the evidence seized on August 16, 2022, Clark argues:

> while [the homeowner] certainly had authority to consent to law enforcement entering and searching the common areas of the residence, she unambiguously lacked lawful authority to consent to the search of backpacks belonging exclusively to Clark, especially where those backpacks were located in a bedroom in which Clark was residing.

(Doc. 56 at 4.)  Clark claims that "[the homeowner] lacked actual authority to consent to the search of [his] backpacks," *id*. at 6, adding that "there is no evidence that law enforcement inquired of [the homeowner] to determine her use of, or control over, and access to Clark's backpacks," *id*. at 7.  Clark requests that all evidence seized during the search of 206 Butler Drive be suppressed.

In response, the Government argues that Deputy Conley did not know how long Clark had been at the residence or whether he was an overnight guest, and he was unaware as to whether Clark had any personal belongings inside the residence.  (Doc. 57 at 16.)   Based on these facts, the Government claims it was reasonable for Deputy Conley "to believe that [the homeowner] had authority over the unmarked bags to lawfully consent to their search." *Id*. at 17.

The Government noted the parties do not dispute the voluntariness of the homeowner's consent rather the issue is "whether her consent lawfully extended to the spare bedroom and the two bags located therein."  (Doc. 57 at 10.)

The issue before this Court is whether the homeowner had the requisite authority to consent to a search of the two backpacks.

## II.A.  Standing

Although the Fourth Amendment protects individuals against unreasonable searches and seizures, "Fourth Amendment rights are personal rights that may not be asserted vicariously." *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004) (citing *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978)).  Therefore, a person seeking suppression of evidence on the basis of a Fourth Amendment violation "'must demonstrate that he personally has an expectation of privacy in the place to be searched, and that his expectation is reasonable[.]'" *Id*. (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)).  A defendant who "fails to prove a sufficiently close connection to the relevant places or objects searched … has no standing to claim that they were searched or seized illegally." *Id*. at 529-30 (internal quotation and citation omitted). *See also United States v. Russell*, 847 F.3d 616, 618 (8th Cir. 2017) (quoting *Barragan*, 379 F.3d at 529-30, quoting *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)).

In *Minnesota v. Olson*, 495 U.S. 91, 98-100 (1990), the Supreme Court held that an overnight guest enjoys a legitimate expectation of privacy in a host's home, and thus standing to claim Fourth Amendment protections relative to that home.  In *Minnesota v. Carter*, "the [Supreme] Court distinguished an 'overnight social guest' from someone 'merely present with the consent of the householder' with no enforceable Fourth Amendment right in the premises." *United States v. Kuenstler*, 325 F.3d 1015, 1020 (8th Cir. 2003) (quoting *Minnesota v. Carter*, 525 U.S. 83, 90-91 (1998) (Carter and another visitor were engaged in packaging cocaine, they had no prior relationship with the lessee as they were "essentially present for a business transaction," more specifically they were there only "to do business" with no showing of an "acceptance into the household" *id*. at 90).

In his pleadings, the Defendant claimed he was an overnight guest at 206 Butler Drive. The Government responded that "[i]t is largely unknown whether Clark was an overnight guest at [the homeowner's] residence or simply a casual visitor." (Doc. 57 at 9.) Clark notes that "Freeman disclosed to law enforcement that Clark had been staying at the residence for several days." (Doc. 56 at 3.) Even so, no evidence was presented regarding Freeman's statement at the hearing, or whether the alleged statement was made before or after the search was completed.

Although the Defendant did not testify, the evidence tending to support that he was an overnight guest includes that his backpacks and one of his cellular phones were found in the spare bedroom of the home; and his vehicle, covered with a tarp, was parked in a small carport behind the house. That said there was no evidence as to whether Clark had been there five hours, or five days. He along with two other individuals were present in the residence at a time when the homeowner was at work. It is unknown whether the other two individuals were friends of Clark's, or the homeowners, or if they were friends of both Clark and the homeowner. Still, as the Government points out, Clark offered no testimonial evidence to support he was an overnight guest and Deputy Conley didn't ask the homeowner why Clark, Freeman, or Hurn were present.

Where a court "finds facts supporting both sides such that it is not 'well positioned' to determine if a party had a reasonable expectation of privacy, it can examine instead the validity of the search." *Kuenstler*, 325 F.3d at 1021. While the record tends to support Clark did not meet his burden to demonstrate he had a legitimate expectation of privacy in 206 Butler Drive, the lawfulness of the search of Clark's backpacks will be examined.

**II.B.  Consent and apparent authority**

The Eighth Circuit summarized the applicable law on consent and apparent authority in *United States v. Williams*:

> Consent is an exception to the warrant requirement, which may be given by a third party with common authority or apparent authority over the premises or effects.  The government bears the burden of proving by a preponderance of the evidence that the co-occupant had sufficient authority to provide consent.  A warrantless search is justified when officers reasonably rely on apparent authority of the third party, even if she lacked common authority.  For apparent authority, we examine whether "the facts available to the officer at the time" of consent would lead a person of reasonable caution to believe the consenter had authority over the item searched.  Common authority is determined from joint access, mutual use, and control, and its existence is a question of fact.

36 F.4th 792, 795-96 (8th Cir. 2022), *petition for reh'g and reh'g en banc denied*, No. 21-2066, 2022 WL 4127210 (8th Cir. Sept. 12, 2022) (citations omitted).

In support of the search, the Government asserts:

> Conley read the Consent to Search form to [the homeowner], including the right to revoke consent at any time, and it was [Deputy Conley's] understanding that [the homeowner] could lawfully grant consent to search the entire residence, to reasonably include the two bags found in an unlocked bedroom with no indication the bags belonged to anyone other than the home's owner until they were opened, and their contents revealed.

(Doc. 57 at 16, citing *United States v. Moran*, 214 F.3d 950, 952 (8th Cir. 2000) and *United States v. Oates*, 173 F.3d 651, 656-57 (8th Cir. 1999).  Under the present facts, the homeowner was aware Deputy Conley would be searching in places where he may find a murder weapon.

In *United States v. Clutter*, the Eighth Circuit observed:

> Although our Fourth Amendment cases sometimes refer indiscriminately to searches and seizures, there are important differences between the two….

> The Amendment protects two different interests of the citizen—the interest in retaining possession of property and the interest in maintaining personal privacy.  A seizure threatens the former, a search the latter.  As a matter of timing, a seizure is usually preceded by a search, but when a container is involved the converse is true.  Significantly, the two protected interests are not always present to the same extent; for example, the seizure of a locked suitcase does not necessarily compromise the secrecy of its contents, and the search of a stopped vehicle does not necessarily deprive its owner of possession.

674 F.3d 980, 984 (8th Cir. 2012) (quoting *Texas v. Brown*, 460 U.S. 730, 747-48 (1983) (Stevens, J., concurring) (other citations omitted)).

Clark cites cases from the Sixth, Seventh, and Tenth Circuits which examine the reasonableness of an officer's reliance on third party consent in a different manner than the Eighth Circuit.  (Doc. 56 at 5-7.)  Clark's reliance on out-of-circuit case law is unpersuasive as this Court is bound to follow Eight Circuit precedent.

The principle of third party consent "does not rest upon the law of property … but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S. 164, 172 n. 7 (1974); *see Frazier v. Cupp*, 394 U.S. 731, 740 (1969) (joint use of duffel bag validated third party's consent to search).

The bottom line according to the Eighth Circuit in *United States v. Clutter*, is that:

> Even when a third party lacks actual authority to consent to search or seizure of shared property or premises, the Fourth Amendment is not violated if the officers reasonably relied on the third party's apparent authority to consent, *United States*

*v. James*, 353 F.3d 606, 615 (8th Cir. 2003), because the Amendment's reasonableness requirement demands of government agents "not that they always be correct, but that they always be reasonable." *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990).

674 F.3d at 983 (limited purpose in temporarily seizing computers from common area of home to avoid destruction of evidence and obtain a search warrant was relevant to determining validity of third party's consent).  *See also United States v. Nichols*, 574 F.3d 633, 636-37 (8th Cir. 2009) (officers reasonably relied on third-party where co-occupant of residence asked officers to meet her at home owned by defendant, met officers at the door, noted she was defendant's girlfriend, freely operated computer to show officers contents of a disc with child pornography, and she had lived at the home for three months).

In deciding whether a party had authority to give consent to search, the officer "must reasonably believe that, given the totality of the circumstances, the third party possesses authority to consent."  *United States v. Weston*, 443 F.3d 661, 668  (8th Cir. 2006) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990); *United States v. Pennington*, 287 F.3d 739, 746-47 (8th Cir. 2002) stating that "[t]he critical facts … are not the actual relationship between the consenter and the owner, but how that relationship appears to the officer who asked for consent.")).  This standard is an objective one: "would the facts available to the officer at the moment … 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises?" *Rodriguez*, 497 U.S. at 189 (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)).

As noted in *Clutter*, the question here is whether Deputy Conley reasonably relied on the homeowner's apparent authority to consent.  A careful analysis of the facts in this case reveals that Deputy Conley was ordered to assist the U.S. Marshals in the apprehension of a

man wanted for murder in Oklahoma. When they found that man, the Defendant Darius Clark, at the suspected location, Clark was in the company of two other individuals—Michael Freeman and Rachel Hurn. Freeman answered the door. It is not clear whether all three occupants were in the living room prior to the arrival of law enforcement. Once the three occupants were safely removed from the home, a homicide detective asked Deputy Conley to secure a red Charger, if it was present, *and* to request consent to search the residence where the Defendant was located to see if the murder weapon could be located. The Charger was immediately observed parked behind the house and mostly covered with a tarp. It was towed away before the homeowner was contacted. Clark was transported to the detention center on the arrest warrant and the homeowner was transported from her workplace to the residence. The homeowner gave both verbal and written consent to search her home with the understanding that the officers were looking for the murder weapon that Clark allegedly used in the Oklahoma murder. During the search of the residence, Deputy Conley determined that one of two bedrooms was clearly occupied by the homeowner. Although three people were present in the residence upon his arrival, Conley had no information regarding whether any of the three people either occupied or were overnight guests in the spare bedroom. In searching the spare bedroom, Deputy Conley observed one backpack in the open area of the room and another backpack on the floor next to the open closet door. The homeowner did not limit the areas that Deputy Conley could search. The doors to both bedrooms and the bathroom were open. Neither backpack was labeled nor were they open in a manner that made their contents visible. A cellular phone was also found near one of the backpacks. The homeowner identified a second cellular phone in the living room as belonging to Clark. She did not identify any other items as belonging to

Clark. When Deputy Conley opened the backpacks, he found items which indicated the backpacks belonged to Clark.

Under the above circumstances Deputy Conley reasonably believed that the homeowner had apparent authority to consent to a search of the unmarked backpacks. The undersigned concludes that the search and seizure of the Air Jordan and Louis Vuitton backpacks along with their contents did not violate the Fourth Amendment. The homeowner in this case had actual authority to consent to the search of the spare bedroom and apparent authority to search the contents of the backpacks located in that room. Additionally, the seizure of the two cellular phones was lawful.

For the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the Motion to Suppress Search of Two Backpacks Located in Residence (Doc. 44) along with their contents be **denied**.

Further, the parties are advised that they have until May 28, 2024, within which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained. Failure to file timely objections may result in a waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Dated this 14th day of May, 2024.

s/*Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE